**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**DAN KAROLEWICZ,**

    **Plaintiff,**

v.                                                      **Case No.: 3:06-cv-641-J-16TEM**

**DRUMMOND PRESS, INC.,**
**a Florida corporation,**

    **Defendant.**

_____/

**ORDER**

This is a patent infringement lawsuit. On June 20, 2006, the United States Patent and Trademark Office ("USPTO") issued Patent No. 7,063,258 ("Patent") to Dan Karolewicz ("Plaintiff"). On February 8, 2008, the Court held a Markman Hearing[1] to determine the meaning of terms "non-magnetic layer" and "magnetic core" found in the Patent's claim 1 ("Claim 1"). The parties disagree as to whether these terms can encompass a conventional flexible magnet consisting of a vinyl binder material containing metallic powder.

The parties filed claim construction briefs (Dkts. 58 and 61) in support of their positions. The Court allowed Plaintiff to file a short brief in opposition ("Opposition Brief") (Dkt. 64) to Drummond's claim construction brief. Following the Markman Hearing the parties submitted proposed conclusions of law and jury instructions relating to claim construction. (Dkts. 66 and 67) (collectively, the "Post-Markman Briefs").

---

[1] Markman v. Westview Instr. Inc., 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Since 1995, claim construction hearings are commonly referred to as "Markman Hearings."

### I.     Brief Factual History

Plaintiff developed the invention for a coin magnet (the "Coin Magnet") while employed at Drummond. The "Coin Magnet" is an "annular (circular type) smooth magnet" affixed to a card that is suitable for mailing. (Dkt. 32, ¶ 6). A Coin Magnet is usually attached to a cardboard postcard that is mailed to consumers who hang the product on a refrigerator or other steel kitchen appliance. (Dkt. 61 at p. 1).

The few facts upon which the parties agree are that Plaintiff began working for Drummond in May of 1998. On March 3, 2006, Drummond terminated Plaintiff. On June 20, 2006, the USPTO issued Plaintiff the Patent for the Coin Magnet. On June 30, 2006, Plaintiff gave Drummond actual notice of his infringement claim. After June 20, 2006, and through the date of the Pretrial Stipulation (Dkt. 51), Drummond sold 5,402,122 Coin Magnet products and received approximately $250,068.12 in gross revenue from those sales.[2]

### II.    Claim Construction

A patent describes the scope and limits of an invention so as to alert the public to that for which the patentee holds the exclusive rights, and all of that which remains open to the public. A patent consists of the specification, which "should describe the invention in clear terms so that a person in the art of the patent may make and use the invention," as well as the claims, which "should 'particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention.'" Katz v. AT&T Corp., 63 F.Supp.2d 583, 589 (E.D.

---

[2] Prior to the filing of the Pretrial Stipulation, the parties acknowledged in various documents that Drummond Press had sold over 4,000,000 coin magnet products and received $175,000.00 in gross revenue.

Pa. 1999) (quoting 35 U.S.C. § 112).[3] The public record of the patent before the USPTO, also includes the prosecution history, which is the written record of the submissions of the patentee and the comments of the USPTO. Together, the claims, specification, and prosecution history constitute the intrinsic evidence of the meaning of the claim terms. See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

The Federal Circuit recently held that when construing claims intrinsic evidence is the critical component. "[W]e have emphasized the importance of intrinsic evidence in claim construction. Phillips, 415 F.3d at 1317. "The intrinsic record in a patent case is the primary tool to supply the context for interpretation of disputed claim terms." V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (citing to Vitronics, 90 F.3d at 1582). Accordingly, "it is well-settled that, in interpreting an asserted claim, the court should first examine the intrinsic record, i.e., the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." Vitronics, 90 F.3d at 1582 (citing to Markman, 52 F.3d at 979).

---

[3] Section 112 of the Patent Act of 1952, Title 35 United States Code, sets the standards for the content of specification and structure of claims. Section 112 reads, in pertinent part:

> The specification shall contain a written description of the invention , and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is the most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention . . . .

35 U.S.C. §112.

"It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips, 415 F.3d at 1312.  Claim construction "begins and ends in all cases with the actual words of the claim," which, absent a special definition spelled out in the specification or prosecution history by the patent applicant, are given their "ordinary and accustomed meaning." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 and 1249 (Fed. Cir. 1998).

The "ordinary" meaning is determined according to an objective standard.  "The focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." Markman, 52 F.3d at 986. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314 (citing to Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).  If the claim terms are ambiguous, courts look to the specification and prosecution history to resolve the ambiguities.  Markman, 52 F.3d at 986.

Once the court has determined the ordinary meaning of the claim terms, it must also consider the specification and, if it is in evidence, the prosecution history to determine whether the patentee provided a distinct definition for a term, or used any terms in a manner inconsistent with their ordinary meaning.[4]  See Vitronics, 90 F.3d at 1582.  Claims can never

---

[4] Robert L. Harmon provides a concise overview of the review process in the most recent edition of Patents and the Federal Circuit:

> If the claim language is clear on its face, then consideration of the rest of the intrinsic

4

be read in isolation, but rather "must be read in view of the specification, of which they are a part." <u>Markman</u>, 52 F.3d at 979. The specification contains a description of the invention, and "[f]or claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." <u>Markman</u>, 52 F.3d at 979. Often the specification,"is the single best guide to the meaning of a disputed term. <u>Vitronics</u>, 90 F.3d at 1582.

Nevertheless, while courts can look to the written descriptions in the specification to define a term already in a claim limitation, courts cannot read a limitation into a claim from the written description. <u>See</u> <u>Renishaw</u>, 158 F.3d at 1248. Courts should not narrow the meaning of the claim terms on the basis of the contents of the specification, by assigning a meaning to the claim terms other than their ordinary meaning, unless either the patentee has explicitly set forth a special, novel definition for a term, or else the "terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim

---

> evidence is restricted to determining whether a deviation from the clear language of the claims is specified. If, however, the claim language is not clear on its face, then consideration of the rest of the intrinsic evidence is directed to resolving, if possible, the lack of clarity. The ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one, subject to the following provisions. First, a different meaning clearly and deliberately set forth in the intrinsic materials the written description or the prosecution history-will control. Second, if the ordinary and accustomed meaning of a disputed term would deprive the claim of clarity, then further reference must be made to the intrinsic - or, in some cases, extrinsic - evidence to ascertain the proper meaning. In either case, a party wishing to alter the meaning of a clear claim term must overcome the presumption that the ordinary meaning is the proper one, demonstrating why such an alteration is required.
>
> Thus, the claim language itself defines the scope of the claim. The construing court does not accord the specification, prosecution history and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language. Nonetheless, without manifest clarity in the claim language alone, the court will consult other sources about the intended meaning of the claim language.
>
> Robert L. Harmon, <u>Patents and the Federal Circuit</u> §6.2 (8th ed. 2007).

may be ascertained from the language used." Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999).

Courts should also consider the prosecution history, the record of correspondence and communications between the inventor and the USPTO, which is kept on file at the USPTO and made available for public inspection. "Although the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." Markman, 52 F.3d at 980 (citation omitted). "If a patentee takes a position before the USPTO, such that a 'competitor would reasonably believe that the applicant had surrendered the relevant subject matter,' the patentee may be barred from asserting an inconsistent position on claim construction." Katz v. AT&T Corp., 63 F.Supp.2d 583, 591 (E.D. Pa. 1999) (citing to Cyber Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998); see also Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed. Cir. 1996). It is well established, however, that "'unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage,' that is, by making a statement that concedes or disclaims coverage of the claims at issue based on a piece of prior art." Katz, 63 F.Supp.2d at 591 (citing to York Prods., Inc. v. Cent. Tractor Farm & Family Ctr., 1568, 1572 (Fed. Cir. 1996)).

A court may consider evidence that is extrinsic to the public record of the patent as well, but it is entitled to very little weight. In most respects, the patent stands alone, and should be interpreted according to its own public record. The testimony and the intent of the inventor offers extremely little probative value in determining the scope of the claims, except to the

extent that it is documented in the prosecution history. See Engel Indus., Inc. v. Lockformer Co., 96 F.3d 1398, 1405 (citing to Markman, 52 F.3d at 985).

**III.   Discussion**

Originally the parties disagreed as to the scope of the Markman Hearing. Plaintiff asked the Court to limit itself to defining the term "magnetic core." Drummond asked the Court to define multiple terms such as "magnetic member," "non-magnetic layer," and "unitary, smooth and solid."[5]

In the Post-Markman Briefs the parties seem to agree that the Court should construe the terms , "magnetic core" and "non-magnetic layer" from Claim 1. Because these terms are in genuine dispute, the Court agrees.

Claim 1 reads, in pertinent part:

> An apparatus comprising: a body having monolithically formed top and bottom surfaces and opposed top and bottom edge portions respectively: and an annular magnetic member directly affixed to one said top and bottom surfaces, said annular member being positioned adjacent to one said top and bottom portions: wherein said annular magnetic member is sufficiently sized and shaped for affixing said body against a support surface elevated from a ground surface, and annular magnetic member having a smooth and arcuate outer perimeter which effectively resists premature peeling and fraying during manufacturing process: wherein said annular magnetic member and said body further have equal thickness for occupying minimum interior space as defined within a postal envelope, wherein said magnetic member has a unitary and solid shape with smooth top and bottom surfaces: wherein said annular magnetic member comprises a **magnetic core**, and a **non-magnetic layer** coated over said

---

[5] In order to avoid "dictal" advisory opinions, Courts are supposed to construe only those terms that the parties genuinely dispute. Courts should adhere to this principle "lest courts construe things that are not in dispute . . . ." See Vivid Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999). Drummond acknowledged that "the understanding of these other terms is not germane to [its] pending motion for summary judgment." (Dkt. 61 at p. 10).

>  magnetic core for protecting said magnetic core from directly contacting undesirable foreign debris.

(Dkt. 61, Ex. 2) (emphasis added).

### A.     Proposed Construction

"Without manifest clarity in the claim language alone, the court will consult other sources about the intended meaning of the claim language." Robert L. Harmon, <u>Patents and the Federal Circuit</u> §6.2 (8th ed. 2007). The words "magnetic," "core," "non-magnetic" and "layer" are not esoteric; however, when detached from the Patent's context, they can be defined only generally - and apparently, as witnessed below, very differently. Thus, when review of the Patent's claim language did not provide the requisite clarity, the Court also considered pertinent language from the Patent's specification and prosecution history.

>  The pertinent Patent specification language is:

>>  Such an annular magnetic member includes a magnetic core and a non-magnetic layer for protecting said magnetic core from directly contacting undesirable foreign debris. A plurality of magnetic members may commercially be produced on a tear resistant roll by "Magnum Magnetic" that is effectively used in conjunction with the commercially available and slightly modified "Tab-master," produced by Kirk-Ruby, Inc. for applying such magnetic members onto the pre-printed bodies.

(Dkt. 61, Ex. 1, Col. 5) (internal references omitted).

In an effort to define the disputed terms, Plaintiff refers to the "magnetic members" made by Magnum Magnetics and cites to definitions from <u>Webster's Seventh New Collegiate Dictionary</u> (1971) ("<u>Webster's Seventh</u>").[6]  First, Plaintiff states:

> The "magnetic member" produced by Magnum Magnetics and sold to [Drummond] is a flexible one, which means it contains magnetic material or powder dispersed in a plastic or rubber base or binder.  The plastic or rubber that surrounds or coats the magnetic material or powder is the reason it can be flexible and is scratch resistant.  Plastic and rubber are not magnetic.  It is the magnetic material, usually a ferrite powder, which is magnetic.  The non-magnetic plastic or rubber surrounds or coats this magnetic core.  The magnetic member described in [Plaintiff's] invention is annular and is very thin and comes on a roll from Magnum Magnetics so that it can be applied to a card by a Kirk-Rudy machine.

(Dkt. 58 at p. 7).

**Magnetic Core**

Based on the above, Plaintiff claims that:

> [N]o construction of the term "magnetic core" can encompass plastic or rubber.  Rather plastic and rubber are non-magnetic materials that are a non-magnetic layer coated over a magnetic core, consisting of magnetic material or powder, which most probably is a ferrite.
>
> The terms magnet and magnetic core are not identical . . . . [O]ne of the definitions of "core" is a "mass of iron serving to concentrate and intensify the magnetic field resulting from a current in the coil.  The key concept is that the core is the iron that concentrates or provides for the magnetic field.

(Dkt. 58 at p. 8, citing to <u>Webster's Seventh</u>).

Citing to the <u>Webster's II New College Dictionary</u> (1986) ("<u>Webster's II</u>"), Drummond claims that the term "magnetic core" or "core" is subject to "alternative interpretations."

---

[6] The term appears in Fig. 5 of the Patent.  Fig. 5 is a drawing of Plaintiff's version of the "magnetic member" having a non-magnetic layer that coated a magnetic core."  (Dkt. 61, Ex. 1).

Drummond states that "the term 'magnetic core' generally refers to a core memory or computer memory - which is obviously not suggested anywhere in the [Patent] specification . . . . Another definition of 'magnetic core' is a specialized meaning of 'core' referring to 'a soft iron rod in a coil or transformer that intensifies and provides for the magnetic field provided by the windings.'" (Dkt. 61 at p. 17).

Drummond suggests that because these definitions are not applicable, it is "appropriate" to interpret the term "magnetic core" by considering the words individually. Drummond defines "core" as 'the innermost or most important part.'" (Dkt. 61 at p. 17, citing to Webster's II at p. 250). Drummond defines "magnetic" as "having the properties of a magnet." Drummond then claims that "core" is "further modified by the term 'magnetic' so this portion of the 'magnetic member' must have the properties of a magnet . . . . The 'magnetic core' section is contrasted with the 'non-magnetic layer' that coats the exterior of the core." (Dkt. 61 at p. 17, citing to Webster's II at p. 657). Essentially, Drummond argues that the term "magnetic core" means either the "innermost section that has magnetic properties" or "the magnet." (Dkt. 61 at p. 12). Or stated somewhat differently, Drummond claims that the "'magnetic core' is a single unitary part located at the innermost section of the 'magnetic member' and which allows the member to be attached a magnetic surface." (Dkt. 61 at p. 18).

**Non-Magnetic Layer**

Plaintiff argues that the "non-magnetic layer" must be comprised of materials that cannot have magnetic properties." (Dkt. 66 at p. 3).  Again, referring to the products made by Magnum Magnetics, Plaintiff states, "[t]he 'magnetic member' produced by Magnum Magnetics and sold to [Drummond] is a flexible one, which means it contains magnetic material or powder dispersed in a plastic or rubber base or binder.  The plastic or rubber that surrounds or coats the magnetic material or powder is the reason it can be flexible and scratch resistant.  Plastic and rubber are not magnetic." (Dkt. 58 at p. 6).

Drummond defines the "non-magnetic layer" as a "single, unitary thin stratum or coating that coats the exterior surface of the 'magnetic core'" and Drummond concludes that "[c]onstrued as such the claim cannot be read on an uncoated or conventional flexible magnet." (Dkt. 61 at p. 2). Drummond claims that "[t]here is absolutely nothing in the [P]atent specification that discloses 'a binder material' and the term 'non-magnetic layer' does not mean a 'binder'. . . . [t]he term bind means . . . 'to cause to stick together in a mass.'"  (Dkt. 61 at p. 18, citing to Webster's II at p. 110).

**B.     Parties' Arguments**

Drummond claims that its proposed construction is supported by the Patent drawings, specifically Fig. 5. Fig. 5, an embodiment of the Patent specification, illustrates the structure of the components described as the "magnetic member" having a "non-magnetic layer that coated a magnetic core." Referring to Fig. 5, Drummond claims that:

> [I]f the term "magnetic core" was intended to be directed to tiny particles as suggested by [Plaintiff], the specification would have used the plural to discuss the presence of "non-magnetic layers" that coated "magnetic

11

> cores" and describes such a structure in his patent application. Likewise, if the "magnetic core" could be interpreted to include a mere particle of powder, it would not perform the function of enabling [the postcard] to be suspended from magnetic surfaces as disclosed . . . . A single metallic particle could not hold the apparatus in place on a steel surface. Accordingly, the claim terms should be further limited to a *single* layer and a *single* core. Such an interpretation is consistent with the drawings.

(Dkt. 61, pp. 14-15).

In his Post-Markman Brief Plaintiff claims that the term "should be construed in its broadest sense and, therefore should mean any composite of materials whether in bar form or in particle (powder) form that have magnetic properties. Accordingly, the 'magnetic core' shown in [Fig. 5] of the Patent may be such a composite of materials that have magnetic properties." (Dkt. 66 at p. 3).

"To avoid importing limitations from the specification into the claims," a court should read the specifications with an eye toward "whether the patentee is setting out specific examples" to teach a person of ordinary skill in the art to make use of the invention, "or whether the patentee instead intends for the claims and the embodiments in the specification to be . . . co-extensive." Pioneer Laboratories, Inc. v. Stryker Corp., 395 F.Supp.2d 612 (W.D. Mich. 2005) (citing to Phillips, 415 F.3d at 1323).

Drummond argues that the Patent's prosecution history precludes any claim construction that would allow it to be "read" onto any conventional, flexible magnet that does not have an external "non-magnetic layer" or coating, such as those produced by Magnum Magnetics.

12

In brief, as originally proposed, the Patent was rejected initially by the USPTO as obvious based on prior art from a patent issued to Rosen (Dkt. 61, Ex. 5) with magnets disclosed by the Martin Publication (Dkt. 61, Ex. 3) and Uffman patent (Dkt. 61, Ex. 6).[7] The magnet described in the Martin Publication was flexible, made from vinyl material and had magnetic material dispersed throughout. The Uffman patent, also disclosed a flexible magnet.

Plaintiff responded to the Patent Examiner's claim of obviousness by formulating what is now known as Claim 1 from the Patent, which includes the requirement that a "non-magnetic layer" coat a "magnetic core." Essentially, Plaintiff did not contest the Patent Examiner's contention that the flexible magnets of Martin and Uffman lacked "non-magnetic layers," instead Plaintiff argued that it was *not* obvious to combine Rosen's non-magnetic layer with the flexible magnets from Martin and Uffman in the manner presented in Claim 1.

Drummond claims that if a non-magnetic layer is implicit in the construction of flexible magnets as Plaintiff claims, then there would have been no need to combine "the Rosen reference with Martin to reach the claimed invention as the [Patent] Examiner proposed. Clearly both the [Patent] Examiner and [Plaintiff] proceeded during the prosecution with the stated assumption that flexible magnets of Martin and Uffman did not have 'non-magnetic layers.' Since [sic] [Plaintiff's] position on the meaning of the claim term is inconsistent with a position he took during prosecution it is incorrect." (Dkt. 61 at p. 17, citing to Alpex Computer Corp. v. Nintendo Co. Ltd., 102 F.3d 1214, 1221 (Fed. Cir. 1996)).

---

[7] Specifically, the Patent Examiner explained that it would have been obvious to combine a "non-magnetic layer" as disclosed by a prior art patent to Rosen with the flexible magnets disclosed by the Martin Publication and Uffman patent. (Dkt. 61, Ex. 4, pp. 40-41).

"Although the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." Markman, 52 F.3d at 980 (citation omitted). "If a patentee takes a position before the USPTO, such that a 'competitor would reasonably believe that the applicant had surrendered the relevant subject matter,' the patentee maybe barred from asserting an inconsistent position on claim construction." Katz v. AT&T Corp., 63 F.Supp.2d 583, 591 (E.D. Pa. 1999) (citing to Cyber Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998)); see also Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531 (Fed. Cir. 1996). It is well established, however, that "'unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage,' that is, by making a statement that concedes or disclaims coverage of the claims at issue based on a piece of prior art." Katz, 63 F.Supp.2d at 591(internal citations omitted).

The Patent specification and prosecution history favor Drummond's proposed construction of the terms "magnetic core" and "non-magnetic layer." While Plaintiff's more elastic definitions would indeed encompass a conventional flexible magnet consisting of a vinyl binder material containing metallic powder, the intrinsic evidence favors Drummond's more circumscribed ones, which do not necessarily preclude a flexible magnet.

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Reinshaw PLC v. Marposs Societa per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998); On Demand Mach.

Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1344 (Fed. Cir. 2006) (holding that "each term must be construed to implement the invention described in the specification.").

This does not appear to be a case in which the written description broadly defines a claim term but nonetheless provides a disclosure of an example of more limited scope, i.e., Fig. 5. In which case, the Court would have followed the Federal Circuits lead and construed the terms at issue more broadly. See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 907-08 (Fed. Cir. 2004) (holding that the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction); see also Gilette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1374 (Fed. Cir. 2005).

Here, Plaintiff demonstrated a clear intention to limit the scope of Claim 1, when he provided the illustration in Fig. 5. In addition, when attempting to distinguish his invention over existing prior art, Plaintiff claimed the "non-magnetic layer" was "essential." In Fig. 5, the "non-magnetic layer" is a coating or covering surrounding a distinct "magnetic core"- in a manner reminiscent of the way the egg white surrounds the egg yolk. If the non-magnetic layer is the "essential" element that Plaintiff claims it is, one must assume that Fig. 5 is co-extensive with the language from Claim 1 and not merely a preferred embodiment. If Fig. 5 is not supposed to be co-extensive with the language from Claim 1, then it is difficult to ascertain how the Patent is not obvious based on the other patents and products revealed in the prosecution history.

**IV.    Conclusion**

Having considered the parties' arguments, it is **ORDERED** that the following Patent terms shall be construed as follows:

**Magnetic Core** is the innermost section that has magnetic properties; and

**Non-Magnetic Layer** is a unitary thin stratum or coating that coats the exterior surface of the "magnetic core."

As now defined, these terms cannot encompass a conventional flexible magnet consisting of a vinyl binder material containing dispersed magnetic material, unless the flexible magnet at issue has a distinct non-metallic layer or coating and an identifiable innermost section with magnetic properties.

It is further O**RDERED** that the cross motions for summary judgment and associated responses already pending (Dkts. 33 and 36) are **DENIED as MOOT**. If necessary, the parties shall re-file any summary judgment motions within twenty (20) days of this Order. Responses shall be due within ten (10) days from the date of the summary judgment filings.

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida on this 19th day of March 2008.

_____
JOHN H. MOORE II
United States District Judge